*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-262

OCTOBER TERM, 2013

| | |
|---|---|
| In re J.H., Juvenile | APPEALED FROM: |
| | Superior Court, Orleans Unit, Family Division |
| | DOCKET NO. 55-8-12 Osjv |
| | Trial Judge: M. Kathleen Manley |

In the above-entitled cause, the Clerk will enter:

Father appeals from a superior court order terminating his parental rights to the minor J.H. He contends the trial court's conclusion that he could not resume parental responsibilities within a reasonable period of time is unsupported by the evidence and findings. We affirm.

The facts may be summarized as follows. J.H. was born in August 2007. Mother and father were not married and separated when J.H. was about two years old. Mother testified that she left the relationship after an incident in which father, in attempting to put on J.H.'s boots, picked him up and slammed him onto a cement floor, fracturing the child's leg. She testified that father had a temper, had physically struck her, and had smashed things when he became angry. She recalled there were "a lot" of times when father "became physical" with J.H.

J.H. lived with mother until he was about four years old, when he was removed from her care by DCF in September 2011 due to safety issues, including her involvement with a sex offender and substance abuse. J.H. was placed with father, who lived with his spouse and their infant child, C.H., who was born in May 2012. At the time, J.H. exhibited significant developmental delays, particularly in the area of his ability to communicate.

In August 2012, J.H. was removed from father's home and taken into DCF custody pursuant to an emergency order as a result of a report of severe, life-threatening injuries to C.H. The court found that an emergency medical services team was dispatched to father's home on August 10, 2012, in response to a call advising that C.H. had stopped breathing. C.H. was treated for seizures and underwent a CAT scan, which revealed bleeding inside the brain, injuries that were later determined to have resulted in permanent brain damage. Doctors also observed bruising on the child's knee, numerous bone fractures, retinal hemorrhages in both eyes, and several bony deformities on the child's ribs, indicating prior injuries. C.H. remained in critical condition on a ventilator for several days. Hospital records also revealed that C.H. had been admitted to hospital a week earlier, on August 3, 2012, with similar, though not as severe, symptoms. A consulting physician testified that the injuries were non-accidental, and were consistent with the symptoms seen in babies who have been shaken violently, commonly in response to frustration with a crying child. Based on the testimony and the events and

circumstances surrounding the incident, the trial court found that it was "highly probable that [father] inflicted the non-accidental injuries to [C.H.]." Father has not challenged these findings.

In October 2012, father stipulated to an admission that J.H. was a child in need of care and supervision based on the non-accidental injuries to C.H. DCF recommended a case plan goal of adoption at the initial disposition stage based on the likelihood that father had inflicted the life-threatening injuries to C.H. and that no safety plan could ensure J.H.'s safety. The State filed a petition to terminate parental rights in late November 2012. The court held a two-day hearing on the petition in April 2013. Mother voluntarily relinquished her parental rights at the outset of the hearing, conditioned on the court terminating father's rights. In June 2013, the court issued a written decision granting the petition as to father.

In addition to the undisputed findings concerning the injuries to J.H., outlined above, and the finding that father was the probable perpetrator, the court also found that mother's testimony concerning father's earlier use of excessive force was credible, that father had stopped participating in supervised visits with J.H. in November 2012 and that he had terminated all contact with J.H. thereafter, despite efforts by DCF to encourage contact. J.H. was ultimately placed with his maternal grandparents, where the court found that he had initially exhibited severe delays and fears, but had later shown improvement in a safe, stable, and loving environment.

Based on the foregoing, the court found that father's relationship with J.H. was limited and marked by prior physical abuse, and that he had stopped all contact since November 2012. In the period since his removal from father's home, J.H. had developed a close and loving relationship with his maternal grandparents, started a new school, and adjusted well to his new home and community. In light of the severe injuries to C.H., and the "reliable evidence that [father] has in the past caused physical harm to [J.H.] when angered," the court concluded that it was highly unlikely that father would be able to address his "emotional dysregulation" sufficiently to be able to safely parent J.H. within a reasonable period of time. Accordingly, the court concluded that termination of father's parental rights was in the best interests of J.H. This appeal followed.

Father contends the evidence and findings do not support the court's conclusion that he could not assume parental responsibilities within a reasonable time, and more specifically that the evidence does "not support the conclusion that the risk of harm J.H. faces in . . . father's custody is as severe as the risk faced by C.H." Father relies on the testimony identifying a crying infant as the common trigger for the loss of impulse control that leads to the kind of injuries suffered by C.H., and suggests that any risk faced by J.H.—who was five years old at the time of the hearing—does not "have enough similarity" to that faced by C.H.

This argument is unpersuasive. It is well established that the neglect or abuse of one child may be probative of risk to a sibling. E.J.R. v. Young, 162 Vt. 219, 224 (1994); In re L.A., 154 Vt. 147, 153 (1990); In re D.P., 147 Vt. 26, 30-31 (1986). As cogently stated in In re D.P., "[w]here serious, life-threatening injuries have been inflicted on one child, the juvenile court will not be required to wait until further injuries are inflicted upon its sibling, previously also a victim." 147 Vt. at 31. Also not persuasive are father's claims that the evidence was insufficient because it principally showed that he harmed only infants, and that any harm to J.H. was too remote in time to be relevant. As we observed In re D.P., rejecting a similar claim, the evidence was insufficient to draw "such a fine line" around father's violent behaviors. Id. Indeed, the

evidence indicates that father's abuse of J.H. ended when the child was two only because mother left the home as a result of his violence toward her as well as the child. Equally unpersuasive is father's corollary claim that, in light of the lesser risk posed to J.H., the evidence was insufficient to support the court's finding he could not learn to moderate his anger within a reasonable period. The brutal assaults on C.H., coupled with the evidence of father's past abuse of J.H., amply supported the court's conclusion that father could not safely resume parental responsibilities within a reasonable time.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

3